UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHNNY B. DELASHAW, JR., M.D.<br><br>Plaintiff,<br><br>vs.<br><br>ALDEN ROBERTS, M.D.; MELANIE DELEON; MICAH MATTHEWS; GORDON WRIGHT; AND STEPHEN CORREA, D.V.M., each in their individual capacities,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I.  NATURE OF ACTION

This is action under 42 U.S.C. § 1983 to redress defendants' violations of plaintiff's constitutional rights to due process and equal protection of the laws, as guaranteed by the 14th Amendment to the United States Constitution, and for related violations of state law.

## II.  PARTIES

1.  Plaintiff Johnny B. Delashaw, Jr., M.D. is a citizen of the United States. He currently resides in the state of Arizona. He is a board-certified neurosurgeon. Until March 1, 2017, he practiced in Seattle, Washington, where he was chair of the Swedish Neurosciences

COMPLAINT - Page 1
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

Institute ("SNI"). Until the illegal actions of defendants intervened, he held unrestricted medical licenses in Washington, California, Alaska and Virginia.

2. Defendant Alden Roberts, M.D. was at all material times a member of the Washington Medical Quality Assurance Commission ("MQAC") and a state actor. He resides in the Western District of Washington. Roberts is sued in his individual capacity.

3. Defendant Melanie deLeon was at all material times MQAC's Executive Director and a state actor. She resides in the Western District of Washington. deLeon is sued in her individual capacity.

4. Defendant Micah Matthews was at all material times MQAC's Deputy Executive Director and a state actor. He resides in the Western District of Washington. Matthews is sued in his individual capacity.

5. Defendant Stephen Correa, D.V.M., was at all material times a MQAC Investigator and a state actor. He resides in the Western District of Washington. Correa is sued in his individual capacity.

6. Defendant Gordon Wright was at all material times a MQAC Staff Attorney and a state actor. He resides in the Western District of Washington. Wright is sued in his individual capacity. Despite his title, defendant Wright was not functioning as attorney or as prosecutor for MQAC; by law, only the Attorney General can serve those functions.

### III.   JURISDICTION AND VENUE

7. This Court has jurisdiction over the parties and the subject matter of this case under 28 USC §§ 1331, 1343 and 1367.

8. Venue is proper in this district under 28 USC § 1391(b). The events giving rise to this claim principally occurred in King County, Washington.

COMPLAINT - Page 2
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

## IV. FACTS

9. In 2013, Dr. Delashaw was the chair of the Department of Neurosurgery at the University of California-Irvine. He had been board certified in neurological surgery since 1993 and engaged in very active clinical practice for more than 25 years. Despite taking care of many high risk patients who required the most challenging types of neurosurgical procedures, Dr. Delashaw's outcomes were consistent with or better than national norms.

10. In June 2013, Dr. Delashaw agreed to join SNI and eventually became its chair. Dr. Delashaw was charged by the leadership of Providence Health & Services ("Providence")—Swedish's parent organization—to make SNI a world-class center for the diagnosis and treatment of neurological disease. It was well-known in the medical community, including at all relevant times to some or all of the defendants, that a number of physicians and staff associated with SNI and Swedish strongly opposed this initiative or were opposed to the then-recent affiliation between Swedish and Providence.

11. On March 29, 2016, MQAC received an anonymous complaint against Dr. Delashaw. The complaint, which the Commission knew or should have known was submitted by one or more professional rivals of Dr. Delashaw seeking to oust him as SNI chair, alleged a pattern of abusive behavior directed towards nurses. The only specific allegation in the complaint, however, was that on December 21, 2015, he threw a telephone at an Operating Room (OR) nurse and a few minutes later screamed at an OR charge nurse.

12. On April 6, 2016, the complaint was reviewed by a panel of four MQAC members, who determined there was sufficient reason to investigate the complaint, but who did not assign a high priority to that investigation.

COMPLAINT - Page 3
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

13. Defendant Dr. Alden Roberts was assigned as Reviewing Commission Member ("RCM"). He was in charge of MQAC's investigation and responsible for making recommendations to his fellow members regarding whether and what action to take against Dr. Delashaw. Dr. Roberts directed MQAC's investigation and made recommendations for further action to other commissioners, MQAC staff, and to the assigned prosecutors from the Attorney General's Office.

14. Defendant Steven Correa, an investigator employed by the Department of Health and assigned to MQAC, was assigned to gather information and conduct witness interviews. His co-defendants knew that Correa—a veterinarian by training—had been a MQAC investigator for only 2 years at the time, and was ill-equipped to conduct complex investigations of the sort undertaken against Dr. Delashaw.

15. By letter dated April 25, 2016, Correa notified Dr. Delashaw of the complaint and investigation, but gave no specifics nor did he request a response. When Dr. Delashaw contacted Correa and asked to be informed of the specifics of the complaint, Correa refused to provide him with any information, other than to say, it sounded like someone was after Dr. Delashaw's SNI chair position, thus confirming Correa's knowledge of the background. Correa actually knew or should have known this background because the Department of Health Facilities Licensing Division ("DOH"), which has jurisdiction over hospitals, was conducting a parallel investigation of a very similar anonymous complaint. DOH listed the MQAC investigation of Dr. Delashaw as a "Companion Case" to its investigation and Correa worked closely with the DOH investigators.

16. Between May 4 and June 3, 2016, Correa interviewed six nurses. Two of them, Trish Flett and Deborah DesJardin-Rowland, were identified by the anonymous complainant.

COMPLAINT - Page 4
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

The others were suggested by Ms. Flett and Ms. Rowland. Correa knew all of the nurses he interviewed would support the allegations of the complaint. Correa did not obtain written or recorded statements from any of them. Instead, he prepared written summaries of their purported statements, which were grossly inaccurate in many instances. According to Correa's reports, the nurses reported various incidents that MQAC later characterized as disruptive behavior by Dr. Delashaw.

17. Despite Correa's efforts to build a case against Dr. Delashaw, none of the nurses or any other witness reported knowledge of the "phone-throwing" incident that was the basis for the original complaint. To the contrary, the nurse at whom the phone was allegedly thrown, Nurse Flett, told Correa—and later, the DOH investigator—that Dr. Delashaw had not thrown a phone at her. Correa also learned that the reason Dr. Delashaw was upset on that occasion was because the charge nurse had unilaterally sent OR staff home for the day, even though Dr. Delashaw had a patient ready for surgery. Correa made no record of this interview or information from Nurse Flett. Instead, he falsely reported he had been unable to speak with this nurse.

18. Correa obtained information from Swedish's then Chief Medical Officer, Dr. John Vassall, who informed Correa of the dynamics at SNI that were behind the allegations against Dr. Delashaw, and who reported that, while there had been complaints against Dr. Delashaw in 2014, Dr. Delashaw responded positively since being advised of those complaints, and that there had been no complaints recently. Dr. Vassall also reported that Dr. Delashaw's surgical results were excellent.

19. Apart from Dr. Vassall, Correa made no effort to identify or interview witnesses not identified by the complainant(s) or persons affiliated with the complainants, even after he

COMPLAINT - Page 5
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

learned that there were witnesses who specifically contradicted the claims made by some of the witnesses identified by the anonymous complainant.

20. After completing the nurse interviews, Correa sent a letter to Dr. Delashaw, dated June 27, 2016. Correa requested a specific response only to the allegation that Dr. Delashaw threw a phone at an OR nurse and later yelled at the nurse's supervisor. Although the letter also asked for answers to general questions regarding whether incidents of disruptive behavior by Dr. Delashaw had been reported to and addressed by Swedish management, contrary to the requirements of state law and MQAC's standard practice, the letter did not disclose or ask for a response to the specific claims made by the six nurses who Correa had interviewed, and which later formed the ostensible basis for summary suspension of Dr. Delashaw's license.

21. Dr. Delashaw responded by letter dated August 3, 2016. He and supporting witnesses who were present in the OR on December 21, 2015, stated that the allegations against him were unfounded. Dr. Delashaw also explained why some nurses working at SNI were unhappy with changes he and the hospital had implemented and how he and the hospital were attempting to address those issues.

22. Four days after receiving Dr. Delashaw's submission, and without conducting any further investigation, defendant Correa prepared a "Confidential Investigative Report," which was sent to defendants Roberts and Wright. The report contained Correa's inaccurate and misleading summaries of witness interviews.

23. During September or October 2016, defendants Roberts and Wright prepared a presentation for a panel of MQAC members. The panel was to decide whether the investigation warranted action against Dr. Delashaw. Roberts and Wright prepared a misleading and one-

COMPLAINT - Page 6
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

sided summary of the investigation, which selectively ignored or mischaracterized Dr. Delashaw's response and failed to mention the findings of the parallel DOH investigation, which found that a similar anonymous allegation of disruptive behavior was unsubstantiated.

24.   On or about October 7, 2016, Roberts and Wright presented the slanted investigation and report to MQAC "Panel B." Panel B had several physician members, including John Rooks, M.D. MQAC panels have authority to initiate disciplinary and summary action. Panel B decided that a statement of charges should be filed against Dr. Delashaw, charging him with unprofessional conduct by reason of disruptive behavior towards nurses. Panel B also decided to seek a summary restriction of Dr. Delashaw's ability to practice: he would be required to have a "safety coach" and oversight in the operating room. If Panel B's decision had been implemented, Dr. Delashaw would have been able to continue practicing in Washington and elsewhere.

25.   When MQAC takes summary action against a physician, it must be able to prove that the physician poses an immediate threat to public health and safety. Defendants knew there was insufficient evidence to make such a showing with respect to Dr. Delashaw. Consequently, they did not implement Panel B's decision.

26.   Defendants did not resume activity concerning Dr. Delashaw until pressured to do so by The Seattle Times, Department of Health leadership, and one or more key legislators. More specifically, in January 2017, defendants learned that The Seattle Times was preparing to publish a story critical of Dr. Delashaw and the Department of Health ("DOH"). The Seattle Times coverage was critical of DOH's investigation of the parallel complaint against SNI with regard to Dr. Delashaw and its finding, after what DOH characterized as a "thorough investigation, that the allegations were "unsubstantiated." Defendants knew via contacts with

COMPLAINT - Page 7
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

The Seattle Times and DOH leadership that the Commission would be the next target of criticism if it did not take action against Dr. Delashaw.

27.    This point was driven home when State Senator Karen Keiser demanded based on The Seattle Times' reports that MQAC "vigorously pursue all significant allegations and evidence." Senator Keiser was chair of the Washington State Senate's Health and Long Term Care Committee and played a key role relative to DOH and MQAC legislation and appropriations, which were at issue during the 2017 regular legislative session.

28.    As a direct result of media and political pressure, defendants and others decided to re-open the investigation of Dr. Delashaw. Correa was directed to interview five physicians who worked at Swedish. Each of these physicians—who were selected for interview because their conflicts with Dr. Delashaw had been reported in The Seattle Times—denied witnessing disruptive behavior towards nurses. With this information, Correa closed his investigation for a second time on March 24, 2017, and forwarded his updated file to Roberts and Wright for their review. Correa made no effort to gather information from Dr. Delashaw or Swedish regarding the renewed allegations of disruptive physician behavior. Had he done so, he would have learned that, at the instance of Swedish, Dr. Delashaw had been evaluated by the Washington Physician Health Program in December 2016 and cleared to practice.

29.    As of May 1, 2017, Defendants knew Dr. Delashaw had resigned from the Swedish staff on March 1, 2017, did not have privileges at any other hospital, and had no immediate plans to resume practice. Defendants also had no evidence indicating that Dr. Delashaw's alleged disruptive behavior had harmed patients.

30.    Notwithstanding these facts, defendants Roberts, Correa, Wright, and de Leon, together with others unknown, agreed to seek immediate summary suspension of Dr.

COMPLAINT - Page 8
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

Delashaw's medical license. On May 3, 2017—two months after Dr. Delashaw stopped practicing and six weeks after completion of the investigation—they caused a statement of charges to be filed against Dr. Delashaw. On the same day, without seeking authority from MQAC Panel B, which had originally determined that only a "safety coach" was necessary, defendants Roberts, de Leon and Wright caused an *ex parte* motion for summary suspension of Dr. Delashaw's license to be filed, supported by the sworn declaration of Correa, to which he attached his inaccurate and misleading interview summaries.

31.   As customarily utilized by MQAC, summary suspension is an unusual measure. For example, in the same time-period during which it summarily suspended Dr. Delashaw's license, MQAC summarily suspended a physician's assistant who allegedly sexually abused patients and offered drugs for sex. Even in that case, it did so only after the practitioner failed to comply with the terms of an earlier informal non-disciplinary disposition. In another action announced the same day, the Commission summarily suspended a physician's license based on his refusal to comply with conditions of a substance abuse monitoring program. In this case as well, the physician's license was not summarily suspended until after he failed to comply with non-punitive requirements imposed by the Commission. These actions are typical of situations where the Commission has imposed summary suspensions.

32.   Addressing alleged disruptive physician behavior through summary disciplinary suspension was unprecedented in MQAC's history. Prior to taking summary action against Dr. Delashaw, MQAC treated disruptive physician behavior as a disabling condition, rather than a basis for disciplinary action. In litigation, which began in 2012 and continued into April 2017, MQAC insisted (and ultimately persuaded the Washington Court of Appeals) that disruptive physician behavior was a disabling condition that, if sufficiently severe, could render a

COMPLAINT - Page 9
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

physician unable to practice with reasonable skill and safety as provided in RCW 18.130.170. Rebutting the argument that allegations of disruptive behavior should be charged as unprofessional conduct under RCW 18.130.180, MQAC told Washington courts that treating disruptive physician behavior as a disabling condition keeps a "clean line between charges of incapacity and unprofessional conduct." Also, in the case before the Washington Court of Appeals, after finding him to be disabled, MQAC merely required the physician to be evaluated by the Washington Physician Health Program ("WPHP") and to follow its recommendations.

33. MQAC's policy on "Practitioners Exhibiting Disruptive Behavior" policy states that disruptive behavior is best addressed by a practitioner's employer or the medical staff of hospitals where an individual practices. MQAC's official interpretation of this policy requires that "multiple independent professionals conclude there is an occupational problem." Defendants Roberts, de Leon, Wright, Correa, and others responsible for requesting summary suspension knew that Dr. Delashaw's employer had evaluated his behavior, implemented measures to address the cause of complaints, and also concluded that Dr. Delashaw could practice safely. Further, but for their deliberate failure to ask, defendants would have known that the Washington Physician Health Program, to which MQAC customarily refers physicians for evaluation of their ability to practice safely, had evaluated Dr. Delashaw at Swedish's request and cleared him safe to practice.

34. Defendants singled out Dr. Delashaw for uniquely adverse treatment, despite their knowledge that he was not an immediate threat to public safety, in order to deflect media and legislative criticism of the Commission and avoid detrimental action by the Legislature, Governor, or Department of Health. Defendants also agreed to request summary suspension

COMPLAINT - Page 10
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

with the knowledge or intent that authorities in other states where Dr. Delashaw is licensed would take reciprocal action.

35. On May 5, 2017, defendants' request for summary suspension was granted by a different panel of MQAC members, without notice or opportunity for Dr. Delashaw to present rebuttal, thereby depriving him of the procedural protections afforded to physicians, including those alleged to be disruptive.  Defendants knew, but did not inform the panel that authorized the summary suspension, that Dr. Delashaw did not pose an immediate threat to public safety, as he was not practicing and had no immediate plans to resume practice.  Defendants and others responsible for requesting summary suspension also knew there was no evidence of patient harm caused by Dr. Delashaw's allegedly disruptive behavior (all of which allegedly occurred in 2015).  Defendants and others responsible for requesting summary suspension recklessly or deliberately failed to advise the panel of these material facts.

36. Summary suspension of Dr. Delashaw was uniquely unwarranted because the usual sanction for a physician with no prior disciplinary record (like Dr. Delashaw) who is found guilty of negligence, incompetence or malpractice, but whose conduct caused no or minimal patient harm ranges from a reprimand to probation.  Furthermore, in cases where it has found physicians unsafe to practice based on disruptive conduct, it typically required that they undergo evaluation by WPHP and follow its recommendations.  These physicians were not prevented from practicing so long as the evaluator found them reasonably safe to practice and they complied with conditions recommended by the evaluator.

37. Defendants knew that summary suspension—lasting until the resolution of charges—is a more severe sanction than Dr. Delashaw was likely to receive if found guilty of the charges alleged.  Furthermore, defendants knew the Commission's burden is much lower

COMPLAINT - Page 11
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

when it seeks an *ex parte* summary suspension than when it seeks to impose discipline or enter a finding that a physician is unable to practice with reasonable safety.  By seeking an *ex parte* summary suspension in the manner that they did, defendants were able to avoid consideration of the available contrary evidence, side-step many of the procedural protections provided by law, and thereby damage Dr. Delashaw's career without ever proving unprofessional conduct or a disabling condition.  Instead, Dr. Delashaw's only recourse with respect to the summary suspension was a "show-cause" hearing conduct before the same panel of MQAC members who initially approved defendants' request, at which the panel simply accepted all of defendants' submissions as true and disregarded all contrary facts.

38.     Before Dr. Delashaw was even notified of MQAC's action, let alone given a chance to defend himself, defendant Matthews advertised defendants' action to key legislators and issued a press release on the subject.  Later, Mathews admitted in an email to Senator Keiser that the summary suspension based on alleged disruptive behavior was a pretext, stating that it was "the most expedient route to the preferred resolution."

39.     Ultimately, a full merits hearing on the Statement of Charges was held.  The panel was comprised of two physicians and a public member, Ms. Winslow.  Ms. Winslow voted for the summary suspension in May 2017, she voted to confirm it at the show cause hearing in June 2017, and over ongoing objection from Dr. Delashaw's counsel, served on the panel for the hearing on the Statement of Charges.  Consistent with this, Ms. Winslow repeatedly asked questions of the witnesses during the first week of the hearing indicating she had already found that Dr. Delashaw committed unprofessional conduct, without ever hearing any of Dr. Delashaw' evidence.

COMPLAINT - Page 12
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

40. In contrast, the two physicians, Dr. Rooks and Dr. Trescott, asked numerous questions of Dr. Delashaw and his witnesses indicating their confusion at how it was that he was summarily suspended in the first place. Dr. Rooks questioned Dr. Delashaw at length about why the Commission failed to work with him before summarily taking him out of practice: "…Since I've been on the commission and you know, every case we get is individual, every doctor is individual, just as our patients….I haven't – I haven't seen, since I've been on the Commission, a situation like this where we just came right to this. Generally, we sit down with people and we recommend a course of correction, things that we can do to make the situation better and get the physician back to work. Was that offered to you or would you be amenable to something like that?" The Presiding Officer, employed by DOH, instructed Dr. Delashaw not to answer.

41. What Dr. Rooks would have heard, which defendants did not want the panel to know, was that Dr. Delashaw made repeated overtures to the Commission to resolve the summary suspension, but defendants declined any resolution short of requiring Dr. Delashaw to participate in and pay for a lengthy inpatient program connected to the Commission's "expert," Dr. Kent Neff, a non-board certified psychiatrist had not seen patients in the preceding five years and who had never seen Dr. Delashaw. Defendants knew or should have known that Dr. Neff's conduct in this regard was a blatant violation of applicable professional standards, but in their haste to meet their political agenda, they ignored Dr. Neff's unethical conduct.

42. Further, in response to testimony from one of Dr. Delashaw's fellows, Dr. Christian Bowers, who commented that a lot of the negative testimony about Dr. Delashaw resulted from certain SNI faculty who were threatened by national practitioners that Dr.

COMPLAINT - Page 13
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

Delashaw had recruited to SNI, Dr. Trescott responded, "[a]nd I think that OR behavior is less of a concern here than organizational behavior and behavior – not necessarily all in the OR…."

43. After the nine-day hearing on the Statement of Charges, the Commission found that Dr. Delashaw had committed unprofessional conduct relative to certain nurses, but immediately reinstated his license subject to a three-year period of what it termed "oversight," which involves Dr. Delashaw obtaining a professional evaluation, following the recommendations of the evaluator, and making periodic appearances before the Commission.

44. The sanction chosen after a full hearing demonstrated that defendants' decision to subject Dr. Delashaw to summary suspension was not justified by any legitimate or rational view of the facts. This conclusion is bolstered by the fact that, after a multiday in-person exam, the evaluators approved by the Commission, and who frequently work for the Commission, found Dr. Delashaw is not a disruptive physician and is safe to practice without any restrictions. Specifically, in contrast to the conclusion reached by the Commission, the evaluators wrote, "Based on our own current clinical and neuropsychological evaluation, records reviewed, testimony from prior psychiatric evaluation, and statement from expert in area of professionalism, it is our conclusion that Dr. Delashaw is at low risk of engaging in disruptive behaviors in the work place. This is the lowest category we assigned because we are never able to assign zero risk to future behaviors."

45. The evaluators further stated, "[W]e cannot conclude with a degree of medical certainty that Dr. Delashaw has a concerning pattern of behavior based in psychopathology that supports the concern that he would be unable to modulate his behavior in the work place or manage to behave in a professionally appropriate manner with co-workers or trainees." They concluded with, "[W]e find that from a psychological perspective Dr. Delashaw is currently fit

COMPLAINT - Page 14
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

to practice safely as a neurosurgeon, as well as fit to function as a healthcare team member and as an educator."

46.  If defendants had not imposed the summary suspension and either proceeded in accordance with MQAC's usual and customary practices in cases involving allegedly disruptive physicians, or proceeded in accordance with the decision of Panel B to require a "safety coach," Dr. Delashaw would not have been damaged to nearly the degree that has resulted from defendants' decision to summarily suspend him. Because they did so, however, Dr. Delashaw has suffered enormous reputational, financial and emotional harm.

47.  In obtaining the summary suspension, defendants acted with evil motives or with reckless disregard of Dr. Delashaw's constitutional rights.

## V.  CLAIMS FOR RELIEF

**A.  42 U.S.C. 1983 – Violation of Constitutional Rights**

48.  Dr. Delashaw re-alleges paragraphs 1-47, above, as if set forth in full.

49.  Defendants, acting under color of state law, deprived Dr. Delashaw of his constitutional right to Due Process afforded to him by the Fourteenth Amendment to the United States Constitution.

50.  Defendants, acting under color of state law, deprived Dr. Delashaw of his constitutional right to Equal Protection of the laws afforded to him by the Fourteenth Amendment to the United States Constitution.

**B.  Tortious Interference with Business Relationship and/or Expectancy**

51.  Dr. Delashaw re-alleges paragraphs 1-47, above, as if set forth in full.

COMPLAINT - Page 15
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986

52. By obtaining his summary suspension for ill-founded and improper reasons, defendants tortuously interfered with Dr. Delashaw's legitimate business and professional expectancy in being able to continue to practice neurosurgery.

**C.     Defamation/False Light**

53. Dr. Delashaw re-alleges paragraphs 1 to 47, as if set forth here in full.

54. Defendants' actions with respect to the summary suspension defamed Dr. Delashaw and placed him in a false light.

## VI.     RELIEF REQUESTED

55. Dr. Delashaw requests entry of judgment against defendants jointly and severally awarding him actual and punitive damages, as well as his costs, including reasonable attorneys fees and expenses under 42 U.S.C. §1988, together with such other and further relief as may be warranted.

## VII.     JURY DEMAND

56. Dr. Delashaw demands a trial by jury on any issue triable of right by a jury.

**DATED** this 21st day of December, 2018.

BENNETT BIGELOW & LEEDOM, P.S.

By   s/ Michael Madden
    Michael Madden, WSBA No. 8747
    Email: mmadden@bbllaw.com

By   s/ Amy M. Magnano
    Amy M. Magnano, WSBA No. 38484
    Email: amagnano@bbllaw.com
    Bennett Bigelow & Leedom, P.S.
    601 Union Street, Suite 1500
    Seattle, Washington 98101-1363
    Telephone: (206) 622-5511
    Fax: (206) 622-8986
    Attorneys for Plaintiff

COMPLAINT - Page 16
Case No.
02975-001\2458714_7.docx

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street, Suite 1500
Seattle, Washington 98101-1363
T: (206) 622-5511  F: (206) 622-8986