1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   JOHNNY B. DELASHAW, JR.,                    CASE NO. C18-1850JLR

11                              Plaintiff,       AMENDED ORDER ON CROSS-
                                                 MOTIONS FOR SUMMARY
          v.                                     JUDGMENT
12

13   ALDEN ROBERTS, et al.,

14                              Defendants.

15                      **I.     INTRODUCTION**

16        Before the court are (1) Plaintiff Johnny B. Delashaw, Jr.'s motion for partial

17   summary judgment (Pl. MPSJ (Dkt. # 74)), and (2) Defendants Alden Roberts, Melanie

18   DeLeon, Micah Matthews, Gordon Wright, and Stephen Correa's (collectively,

19   "Defendants") motion for summary judgment (Def. MSJ (Dkt. # 38)).  Both motions are

20   opposed.  (*See* Pl. Resp. to Def. MSJ (Dkt. # 52); Def. Resp. to Pl. MPSJ (Dkt. # 75).)

21   The court has considered the motions, the parties' submissions in support of and in

22   opposition to the motions, the relevant portions of the record, and the applicable law.

1    Being fully advised,[1] the court GRANTS Defendants' motion for summary judgment and

2    DENIES Dr. Delashaw's Motion for Partial Summary Judgment.

3                              **II.    BACKGROUND**

4    **A.    Complaint and Investigation**

5            On March 29, 2016, the Washington Medical Commission ("WMC") received an

6    anonymous written complaint about Dr. Delashaw.  (1st Barbara Decl. (Dkt. # 39) ¶ 2,

7    Ex. A.)  The complaint stated that On December 21, 2015, Dr. Delashaw threw a phone

8    at a nurse in an operating room ("OR").  (*Id.*)  It further reported that Dr. Delashaw

9    "screamed at" the charge nurse "and threatened her job."  (*Id.*)  The complaint further

10   stated that "[t]here have been other similar instances that have been reported to the

11   administration" and that Dr. Delashaw's behavior "seems to be an ongoing problem."

12   (*Id.*)  The anonymous complainant "apologize[d] for the anonymous nature of this

13   communication" and stated that "[i]t is presented in this manner out of fear of retribution

14   or retaliation if done openly."  (*Id.*)

15   //

16

17          [1] Mr. Delashaw and Defendants both request oral argument.  (*See* Pl. MPSJ at 1; Def.
     MSJ at 1.)  Oral argument is not necessary where the non-moving party suffers no prejudice.  *See*
18   *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984); *Mahon v. Credit Bureau of Placer Cty.
     Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999) (holding that no oral argument was warranted where
19   "[b]oth parties provided the district court with complete memoranda of the law and evidence in
     support of their respective positions," and "[t]he only prejudice [the defendants] contend they
20   suffered was the district court's adverse ruling on the motion.").  "When a party has an adequate
     opportunity to provide the trial court with evidence and a memorandum of law, there is no
     prejudice [in refusing to grant oral argument]."  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir.
21   1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724,
     729 (9th Cir. 1991)) (alterations in *Partridge*).  Here, the issues have been thoroughly briefed by
22   the parties, and oral argument would not be of assistance to the court.  *See* Local Rules W.D.
     Wash. LCR 7(b)(4).  Accordingly, the court DENIES the parties' requests for oral argument.

1    On April 5, 2016, WMC authorized investigation of the anonymous complaint

2  against Dr. Delashaw.  (1st Barbara Decl. ¶ 3, Ex. B.)  On April 6, 2016, Defendant

3  Stephen Correa was assigned to investigate Dr. Delashaw's case.  (*Id.* ¶ 4, Ex. C.)  On

4  April 25, 2016, the Medical Quality Assurance Commission ("MQAC") sent a letter to

5  Dr. Delashaw informing him that it would investigate his case and informed him that Mr.

6  Correa was the investigator assigned to his file.  (*Id.* ¶ 5, Ex. D.)  Dr. Delashaw testified

7  at his deposition that after receiving this letter, he called Mr. Correa to ask what it was

8  about, but that Mr. Correa refused to tell him, although Mr. Correa disputes Dr.

9  Delashaw's version of events.  (1st Madden Decl. (Dkt. # 34) ¶ 2, Ex. 1 ("Delashaw

10  Dep.") at 76:18-77:19.)

11    Between May 5, 2016, and June 30, 2016, Mr. Correa spoke with seven nurses

12  who worked with Dr. Delashaw.  (*See* 1st Madden Decl. ¶ 5, Ex. 4.)  According to Mr.

13  Correa's interview notes, each of these nurses described at least one incident of

14  unprofessional conduct by Dr. Delashaw.  (*See, e.g.*, *id.* at 3 (Ms. Desjardin-Rowland

15  describing how Dr. Delashaw "pointed his finger at her, became red[-]faced, and began

16  yelling at her" and describing that 19 staff left the OR in the prior twelve months "mostly

17  because" of Dr. Delashaw), 6 (Elizabeth Hendershott, a former Swedish Swedish

18  Neurosciences Institute ("SNI") OR nurse, describing that she left Swedish "as a result of

19  [Dr. Delashaw's] behavior" and that "there have been sixteen or seventeen other

20  employees who have left as a result of [Dr. Delashaw's] behavior"), 8 (Ms. Hendershott

21  describing among other incidents that in the OR, Dr. Delashaw "invaded her space,

22  leaned forward while yelling at her, and she was concerned he might have become

physical"), 14 (Mary Fearon describing how Dr. Delashaw "repositioned [an] anesthetized patient in a very rough manner"), 20 (Rose Raney describing that nursing staff was "very stressed" around Dr. Delashaw and that they may be spending more time trying to "avoid his vision to keep from getting yelled at" rather than focusing on monitoring the patient), 27-28 (Bernedette Haskins describing an incident in which Dr. Delashaw took X-rays when not all of the medical staff was ready and in adequate protective gear, and when Ms. Haskins told Dr. Delashaw that not everyone was ready, Dr. Delashaw stepped toward her, pointed his finger at her, and began yelling at her).) According to Mr. Correa's notes, nearly every nurse he spoke to during this time told him that nurses and other staff left SNI because of Dr. Delashaw's behavior, some stating that over twenty employees left for this reason.  (*See id.* at 3, 6, 11, 19, 23, 32.)

On June 27, 2016, Mr. Correa sent another letter to Dr. Delashaw that attached a copy of the anonymous complaint against him and asked him to provide a response to the allegations in the complaint and to answer questions related to the complaint.  (1st Barbara Decl. ¶ 6, Ex. E.)  The letter asked Dr. Delashaw to respond no later than July 14, 2016.  (*Id.*)  The letter did not discuss the additional allegations from the nurses to whom Mr. Correa spoke.  (*Id.*)

On July 20 and 21, 2016, Washington Department of Health ("DOH") investigators visited SNI where Dr. Delashaw worked, and interviewed executives, staff, nurses, and others, and concluded that the allegations against Dr. Delashaw could not be substantiated "due to lack of evidence."  (*See* 1st Madden Decl. ¶ 21, Ex. 20.)

//

ORDER - 4

1    Dr. Delashaw responded to Mr. Correa's letter on August 3, 2016, through his

2   attorneys.  (1st Barbara Decl. ¶ 7, Ex. F.)  The letter stated that "Dr. Delashaw can state

3   categorically that he has never thrown anything at anyone in the operating room, and he

4   has never screamed at a charge nurse."  (*Id.*)  The letter explained that Dr. Delashaw's

5   attorney "interviewed all of the neurosurgeons who were present in Dr. Delashaw's

6   surgeries on December 21, 2015," as well as several other individuals, "and not a single

7   person witnessed anything like what was described in the anonymous complaint, nor was

8   anything reported that was consistent with the anonymous complaint."  (*Id.*)  The letter

9   further stated that Patricia Hudson, the Director of Human Resources at Swedish Hospital

10   ("Swedish"), "has never received a complaint that Dr. Delashaw has thrown anything, or

11   raised his voice to anyone on the staff."  (*Id.*)  The letter acknowledged that "a few

12   nurses" made complaints that Dr. Delashaw "appeared to be intimidating or rude," but

13   that Dr. Delashaw took those complaints seriously.  (*Id.*)  The letter concluded:

14   "Accordingly, we would request that the Commission close this investigation with no

15   action."  (*Id.*)  The letter attached declarations from several individuals at Swedish that

16   vouched for statements made in the letter.  (*Id.*)

17    On August 8, 2016, Mr. Correa submitted his investigative report, which the

18   Director of Investigation approved the next day.  (*Id.* ¶ 9, Ex. G.)  Defendant Alden

19   Roberts was the Reviewing Commission Member ("RCM") for the licensing action

20   against Dr. Delashaw.  (1st Barbara Decl. ¶ 39, Ex. LL ("Roberts Dep.") at 8:11-22,

21   12:22-25.)  Mr. Roberts reviewed the investigation and prepared an "RCM Case Review"

22   form to present the case to a WMC disposition panel.  (*Id.* ¶ 9, Ex. H.)  The RCM Case

1    Review summarized the interviews conducted during the investigation and recommended

2    "[p]ossible summary suspension on patient safety grounds.  Minimum of SOC for

3    unprofessional conduct.  I would also recommend forwarding to DOH to investigate

4    hospital regarding a hostile work environment with patient safety implications." (*Id.*)  On

5    October 7, 2016, a Case Review Disposition panel reviewed Dr. Delashaw's case, heard

6    Dr. Roberts' presentation, and requested the filing of a Statement of Charges and

7    summary action be taken against Delashaw's license, including appointment of a "safety

8    coach." (1st Barbara Decl. ¶ 10, Ex. I).

9         In early March 2017, Dr. Delashaw voluntarily resigned from SNI. (*See* Delashaw

10   Dep. at 8:21-12:3.)  On March 24, 2017, Mr. Correa submitted additional investigation

11   findings regarding Dr. Delashaw. (*See* 1st Madden Decl. ¶ 36, Ex. 35.)  Dr. Correa

12   reported that he had interviewed five physicians who had worked with Dr. Delashaw, that

13   "[a]ll of the physicians interviewed expressed concerns, to varying degrees, with regard

14   to [Dr. Delashaw's] behavior," and that the behavior "included threats of firing staff, lack

15   of sensitivity in dealing with patient's [(sic)] families, retaliation against those who

16   questioned his decisions and/or practice, and creating a toxic work environment." (*Id.*)

17        On May 3, 2017, WMC executed its Statement of Charges against Delashaw. (1st

18   Barbara Decl. ¶ 11, Ex. J.)  It recited the allegations against Dr. Delashaw and alleged

19   that Dr. Delashaw committed unprofessional conduct in violation of RCW 18.130.180(4).

20   (*Id.*)  Defendant Melanie DeLeon reviewed and signed the Statement of Charges. (*Id.*)

21   Ms. DeLeon testified that she signed it because she was the designated WMC signatory,

22   //

1   not based on any independent assessment of the case.  (1st Barbara Decl. ¶ 32, Ex. EE

2   ("DeLeon Dep.") at 196:10-14, 193:8-194:4, 194:25-195:11.)

3          Also on May 3, 2017, the Washington State Attorney General's Office ("AGO"),

4   through Assistant Attorney General Tracy Bahm, filed an *ex parte* motion for summary

5   action with MQAC and requested that MQAC "enter an [o]rder suspending [Dr.

6   Delashaw's] license to practice as a physician and surgeon in the state of Washington,

7   pending further disciplinary proceedings."  (1st Barbara Decl. ¶ 12, Ex. K.)  The motion

8   did not discuss Dr. Delashaw's voluntary resignation.  (*See generally id.*)  Along with the

9   motion, the AGO filed a declaration from Mr. Correa that included materials from the

10  investigation of Dr. Delashaw.  (*Id.* at 7-34.)  Dr. Roberts reviewed the motion before it

11  was filed.  (*See* 1st Madden Decl. ¶ 45, Ex. 44 at 2.)

12         On May 5, 2017, the WMC *Ex Parte* Panel granted the *ex parte* motion and

13  summarily suspended Dr. Delashaw's license pending further disciplinary proceedings by

14  WMC.  (1st Barbara Decl. ¶ 13, Ex. L.)  The panel concluded that the allegations against

15  Dr. Delashaw, supported by Mr. Correa's declaration, "justify the determination of

16  immediate danger in this case and a decision to immediately suspend the credential until

17  a hearing on the matter is held."  (*Id.*)  The panel further concluded that "the requested

18  summary action is necessary and adequately addresses the threat to public health and

19  safety."  (*Id.*)  Following publication of the summary suspension order, Dr. Delashaw's

20  licenses to practice medicine in Alaska, California, and Virginia were suspended.

21  (Delashaw Dep. at 165:2-22.)

22  //

1   **B.     Dr. Delashaw's Challenge to the Summary Suspension**

2          On May 30, 2017, Dr. Delashaw requested a show cause hearing and answered the

3   statement of charges.  (1st Barbara Decl. ¶¶ 14, 15, Exs. M, N.)  He then filed briefing

4   arguing that DOH failed to meet its burden to establish that Dr. Delashaw presented "an

5   immediate threat to public health and safety."  (*Id.* ¶ 16, Ex. O at 42.)  After a June 12,

6   2017, show cause hearing, MQAC ordered that Dr. Delashaw's summary suspension

7   would remain in effect pending a full adjudication of the allegations against him.  (*Id.*

8   ¶ 18, Ex. Q at 6.)

9          On September 15, 2017, Dr. Delashaw filed a motion to vacate the *ex parte* order

10  of summary suspension and to dismiss the investigation into his actions. (*Id.* ¶ 19, Ex. R

11  at 1, 80.)  Among other arguments, Dr. Delashaw argued that MQAC's summary

12  suspension of his license "unconstitutionally deprived Dr. Delashaw of his due process

13  rights" by "providing inadequate notice of the substance of the complaint that formed the

14  basis of the summary suspension, and deprived him of the opportunity to respond before"

15  suspending his license.  (*Id.* at 2, 5.)  Dr. Delashaw further argued that WMC "conducted

16  an inadequate investigation that produced unreliable and insufficient evidence."  (*Id.* at

17  3.)  Dr. Delashaw also alleged that WMC "knew full well that Dr. Delashaw did not

18  present an 'immediate risk' to public health and safety" when it investigated him.  (*Id.* at

19  4-5.)  The WMC responded to Dr. Delashaw's motion, and specifically challenged his

20  due process attack.  (1st Barbara Decl. ¶ 20, Ex. S at 13-16.)  MQAC construed Dr.

21  Delashaw's motion as a motion for summary judgment and denied it.  (1st Barbara Decl.

22  ¶ 22, Ex. U at 1.)  In doing so, MQAC analyzed and rejected Dr. Delashaw's due process

1   arguments, finding that DOH followed its own statutory and procedural requirements.

2   (*Id.* at 8-9.)

3   **C.    Evidentiary Hearing**

4           A MQAC panel held a full evidentiary hearing on April 23-26 and April 30-May

5   4, 2018.  (*See* 1st Barbara Decl. ¶ 23, Ex. V ("MQAC Final Order") at 3.)  The panel

6   heard testimony from over 20 witnesses, including Dr. Delashaw, and admitted 297

7   exhibits.  (*See id.* at 3-13.)  The MQAC panel issued findings of fact and conclusions of

8   law.  (*See generally id.*)

9           Among other findings, the panel concluded that Dr. Delashaw "engaged in

10  multiple acts of intimidation of hospital staff, forming a disturbing pattern of behavior"

11  and that Dr. Delashaw's "behavior also discouraged staff from asking questions and,

12  consequently, put patients at risk of medical error."  (*Id.* at 15, 20.)  With respect to the

13  incident complained of in the anonymous complaint that triggered the investigation, the

14  panel concluded that Dr. Delashaw "either threw the phone or slammed the phone down

15  in anger, as the phone went sliding across the floor" (*id.* at 15); told nurse Trish Flett that

16  she "should start looking for another job" (*id.*); and yelled at Ms. Desjardin-Rowland

17  while standing so close to her that "she could feel [Dr. Delashaw's] spit on her arms" (*id.*

18  at 16).  The panel included four additional examples of what it concluded to be

19  intimidating behavior by Dr. Delashaw.  (*See id.* at 16-19.)  The panel further found that

20  Dr. Delashaw discouraged staff members from reporting errors (*see id.* at 19-20),

21  discouraged staff from asking questions (*id.* at 20), and contributed to the loss of

22  personnel (*id* at 21).

1    The panel made specific findings regarding witness credibility, and, notably,

2  found that the testimony of the nurses that worked with Dr. Delashaw to be credible and

3  found that those nurses "provided convincing testimony that [Dr. Delashaw] engaged in

4  disruptive behavior."  (*Id.* at 22-23.)   In contrast, the panel found "the testimony of the

5  former fellows and physicians who testified on behalf of [Dr. Delashaw] to not be

6  persuasive."  (*Id.* at 23.)  The panel further found that Dr. Delashaw was not credible with

7  regard to "the issue of whether or not [Dr. Delashaw] was engaged in disruptive conduct

8  during his time at SNI."  (*See id.* at 23-24 ("On the whole, [Dr. Delashaw's] testimony

9  was self-serving, and he blamed the problems at SNI and Swedish-Cherry Hill Hospital

10  on others.").)  Finally, the panel concluded:

11         Any internal disputes that [Dr. Delashaw] may have had with other
           physicians at SNI regarding salaries or other administrative control of SNI,
12         or any workload disputes that the nurses at Swedish-Cherry Hill had with
           physicians and management staff, are not relevant to the fact that [Dr.
13         Delashaw] committed disruptive physician behavior.

14  (*Id.* at 30.)

15    In its conclusions of law, the panel concluded that it was "proved by clear and

16  convincing evidence that [Dr. Delashaw] committed unprofessional conduct as defined in

17  RCW 18.130.180(4)."  (*Id.* at 31.)  After considering aggravating and mitigating factors,

18  the panel, among other orders: (1) reinstated Dr. Delashaw's license to practice as a

19  physician and surgeon in Washington State, but placed him on administrative oversight

20  for a three-year period; (2) ordered a comprehensive evaluation of Dr. Delashaw's

21  disruptive behavior; (3) imposed employment restrictions, included precluding Dr.

22  Delashaw from holding a medical leadership position.  (*Id.* at 26-28.)

1    In October 2018, Dr. Delashaw initiated judicial review of the WMC's final order

2    in Thurston County Superior Court.  (*See* 1st Barbara Decl. ¶ 25, Ex. X.)  The Superior

3    Court affirmed WMC's final order and concluded that Dr. Delashaw "fail[ed] to establish

4    that the proceeding was fundamentally unfair, either in substance or by appearance."

5    (*See* 1st Barbara Decl. ¶ 29, Ex. BB ("Superior Court Order") at 5.)

6    ### III.    ANALYSIS

7    Dr. Delashaw maintains the following claims against Defendants:  Claims under

8    42 U.S.C. § 1983 for violation of Dr. Delashaw's constitutional rights to due process and

9    equal protection, and for retaliation based on Dr. Delashaw's First Amendment right to

10   access the courts (*see* FAC (Dkt. # 10) ¶¶ 53-56); and Washington state law claims for

11   tortious interference, defamation, and false light (*id.* ¶¶ 57-60).  Defendants move for

12   summary judgment on all of Dr. Delashaw's claims, primarily on the basis of claim and

13   issue preclusion, absolute immunity and qualified immunity against Dr. Delashaw's

14   Section 1983 claims, and state statutory immunity against Dr. Delashaw's state law

15   claims.[2]  (*See generally* Def. MSJ.)  Dr. Delashaw cross-moves for partial summary

16

17   [2] The court declines to address Defendants' preclusion arguments (*see* Def. MSJ at 6-7;
     Def. Resp. to Pl. MSJ at 10-11) because the court concludes that Defendants are entitled to
18   summary judgment on other grounds, *see infra* §§ III.B-D.  The court notes, however, that
     Defendants' preclusion arguments are too underdeveloped to adjudicate at this time.  Defendants
19   contend that issue preclusion prevents Dr. Delashaw from relitigating MQAC's factual findings
     "regarding his disruptive behavior" (Def. MSJ at 6), but do not specify the specific factual
20   findings they contend fit under that umbrella term or explain in any detail how Dr. Delashaw is
     attempting to relitigate those factual findings in this case.  Similarly, Defendants assert that claim
21   preclusion bars Dr. Delashaw's due process claim (*id.* at 7) but fail to address how the elements
     of claim preclusion apply here.  The court will not do Defendants' work for them.  *See United*
22   *States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for
     truffles buried in briefs.").

1    judgment on his Section 1983 claims for due process and equal protection violations.

2    (*See generally* Pl. MPSJ.)  The court sets forth the applicable summary judgment

3    standard before addressing the parties' motions.

4    **A.    Legal Standard**

5          Summary judgment is appropriate if the evidence viewed in the light most

6    favorable to the non-moving party shows "that there is no genuine dispute as to any

7    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

8    56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*,

9    816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome

10   of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute

11   is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the

12   non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)

13   (citing *Anderson*, 477 U.S. at 248-49).

14         The moving party bears the initial burden of showing there is no genuine dispute

15   of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

16   323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

17   show the absence of such a dispute in two ways:  (1) by producing evidence negating an

18   essential element of the nonmoving party's case, or (2) by showing that the nonmoving

19   party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

20   *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

21   meets its burden of production, the burden then shifts to the nonmoving party to identify

22   //

1    specific facts from which a factfinder could reasonably find in the nonmoving party's

2    favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

3    **B.    Absolute Immunity**

4    Defendants move for summary judgment in favor of Mr. Roberts, Mr. Wright, and

5    Ms. DeLeon on Dr. Delashaw's Section 1983 claims based on absolute immunity.  (*See*

6    Def. MSJ at 8-9.)  Defendants also raise absolute immunity in response to Dr.

7    Delashaw's motion for summary judgment on his due process and equal protection

8    claims.  (*See* Def. Resp. to Pl. MPSJ at 11-12.)

9    Absolute immunity protects "individuals performing functions necessary to the

10   judicial process" from suit.  *See Miller v. Gammie*, 335 F.3d 889, 895-96 (9th Cir. 2003).

11   Absolute immunity "shields only those who perform a function that enjoyed absolute

12   immunity at common law."  *See id.* at 897 (citing *Antoine v. Byers & Anderson, Inc.*, 508

13   U.S. 429, 435-36 (1993)).  Absolute immunity's protections depend solely on "the

14   specific function performed, and not the role or title of the official."  *Id.* at 897.

15   Defendants "bear the burden to show that their respective common-law functional

16   counterparts were absolutely immune."  *Id.* at 898.  Unless the official's action "has the

17   requisite connection to the judicial process, only qualified immunity is available."

18   *Constanich v. Dept. of Soc. & Health Servs.*, 627 F.3d 1101, 1109 (9th Cir. 2010).

19   Absolute immunity applies to quasi-prosecutorial actions that are "part and parcel

20   of presenting the state's case as a generic advocate."  *Hardwick v. Cty. of Orange*, 844

21   F.3d 1112, 1115 (9th Cir. 2017).  However, absolute immunity is not available for an

22   //

1    official's "investigatory conduct, discretionary decisions, or recommendations." *Tamas*

2    *v. Dep't of Soc. & Health Servs., State of Wash.*, 630 F.3d 833, 842 (9th Cir. 2010).

3         1.  <u>Mr. Roberts</u>

4         Defendants contend that Mr. Roberts, "as the RCM [for the licensing action

5    against Dr. Delashaw], clearly exercised quasi-prosecutorial discretion." (Def. MSJ at 8.)

6    According to Defendants, Mr. Roberts' "presentation to the Disposition Panel is akin to

7    prosecutors presenting to a grand jury," and "[a]ny decision he made relative to *ex parte*

8    motions and sanctions was akin to prosecutors deciding on bail recommendations." (*Id.*)

9    Defendants further argue that Mr. Roberts' role as the RCM "was to prosecute the case

10   up to the hand off to an [assistant attorney general] who would complete the prosecution

11   with the filing of the Statement of Charges." (*Id.*)

12        In response, Dr. Delashaw points to RCW 18.130.150(11), which Dr. Delashaw

13   contends provides RCMs authority to "direct investigations," but confers discretion to file

14   charges or make a summary suspension request only on panels of three or more members.

15   (Pl. Resp. to Def. MSJ at 5.) Dr. Delashaw also contends that the Disposition Panel did

16   not grant Dr. Roberts discretion to determine the form of summary action against Dr.

17   Delashaw, an action that would not be supported by any WMC rule or policy. (*Id.* at 6.)

18   Finally, Dr. Delashaw points to Dr. Roberts' deposition, at which Dr. Delashaw asserts

19   Dr. Roberts denied exercising prosecutorial discretion:

20           Q. So, are you telling us that you, as the RCM, could proceed on your own
             to authorize the staff and attorneys to prepare and submit a motion for *ex*
21           *parte* summary suspension?
             MR. BARBARA: Objection to the form. You can answer.
22           THE WITNESS: No, sir.

1   (*Id.* at 7 n.8 (quoting 1st Madden Decl. ¶ 23, Ex. 22 ("Roberts Dep.") at 111:2-15).)

2         In reply, Defendants contend that "[d]uring his presentation to the WMC

3   Disposition Panel in October 2016, Dr. Roberts' only function was as a

4   quasi-prosecutor," because "[h]e was not directing any investigation," but rather

5   "evaluated the information Dr. Correa's investigation uncovered, presented the case to

6   the Disposition Panel, and made two recommendations:  (1) a Statement of Charges

7   should issue; and (2) an immediate threat to public health and safety warranted summary

8   action in the form of a suspension."  (Def. MSJ Reply (Dkt. # 56) at 3.)  Dr. Roberts also

9   played a role in deciding "what should be included in the Statement of Charges and what

10   sanction should be sought in a motion for summary action."  (*Id.*)

11         The court agrees that Dr. Roberts acted in a quasi-prosecutorial function in his

12   preparation for and presentation to the October 2016 Disposition Panel.  Dr. Delashaw

13   confuses the authority to *authorize* a summary suspension with the function of *seeking* a

14   summary suspension.  Indeed, a three-person Disposition Panel approved the Statement

15   of Charges against Dr. Delashaw, but only after Dr. Roberts sought that result from the

16   Panel on behalf of DOH.  (Roberts Dep. at 21:2-22:13; 25:20-22.)  Dr. Roberts'

17   preparation for and presentation to the Disposition Panel was a quintessential

18   quasi-prosecutorial function because he contributed "as an advocate to an informed

19   judgment by an impartial decisionmaker."  *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th

20   Cir. 1991).

21         Dr. Delashaw's citations to Dr. Roberts' deposition are unavailing.  The fact that

22   Dr. Roberts could not proceed "on his own" to submit a motion for ex parte summary

1    suspension (Roberts Dep. at 111:2-15), or that he did not "authorize" the summary

2    suspension (*id.* at 118:24-119:11) do not change the primary function he served—that of

3    an advocate before an impartial decisionmaker in a formal process authorized by statute.

4    Dr. Delashaw's reliance on *Malley v. Briggs*, 475 U.S. 335, 342 (1986), is similarly

5    unavailing.  (*See* Pl. MSJ Reply (Dkt. # 76) at 7.)  In that case, the Supreme Court held

6    that a police officer seeking an arrest warrant is not absolutely immune and rejected the

7    comparison between that action and that of a prosecutor presenting to a grand jury.

8    *Malley*, 475 U.S. at 342.  The Court rejected that comparison because at common law,

9    although prosecutors were absolutely immune from malicious prosecution suits, the

10   Court did not find "a comparable tradition of absolute immunity for one whose complaint

11   causes a warrant to issue," and because the function of applying for a warrant "is further

12   removed from the judicial phase of criminal proceedings than the act of a prosecutor in

13   seeking an indictment," the latter of which is "but the first step in the process of seeking a

14   conviction."  *Id.* at 342-43.  Here, Dr. Roberts' advocacy for the Statement of Charges

15   before the Disposition Panel was "but the first step" in seeking an *ex parte* motion against

16   Dr. Delashaw and is akin to a prosecutor presenting to a grand jury.  Therefore, Dr.

17   Roberts is absolutely immune from Dr. Delashaw's Section 1983 claims because they are

18   based on his actions to prepare for and present before the Disposition Panel and any

19   subsequent advocacy before an MQAC panel for sanctions to issue against Dr. Delashaw.

20   //

21   //

22   //

ORDER - 16

1          2.  Ms. De Leon

2          Defendants base their claim of absolute immunity with respect to Ms. DeLeon on

3    her signature as the "hand of the commission" and contend that act "is clearly a

4    quasi-prosecutorial act whether done at the direction of WMC or as an act of independent

5    judgment."  (Def. MSJ at 8.)  Plaintiffs contend that the basis of Ms. DeLeon's liability is

6    not her signing the Statement of Charges, but rather her authority and failure to "halt

7    submission of the materially misleading *ex parte* motion."  (Pl. Resp. to Def. MSJ at 8.)

8    Ms. DeLeon did in fact review the *ex parte* motion for summary suspension before it was

9    filed, and as WMC's Executive Director, had the authority to direct that the motion be

10   revised or withdrawn.  (*See* DeLeon Dep. at 139:15-143:17.)  Plaintiffs contend that this

11   was an administrative task, not a quasi-prosecutorial one.  (Pl. MSJ Reply at 6.)

12         Regardless of whether the issue is framed as Ms. De Leon's review of the

13   Statement of Charges, her failure to withdraw or correct (in Dr. Delashaw's view) the

14   Statement of Charges, or her signature on the Statement of Charges, Ms. DeLeon's role

15   vis-à-vis the Statement of Charges was a quasi-prosecutorial one and Ms. De Leon is

16   entitled to absolute immunity for it.  Plaintiffs' contention that Ms. De Leon's failure to

17   direct a correction or withdrawal of the Statement of Charges is an administrative, not

18   judicial, function, is unavailing, just as the argument that a superior directing an assistant

19   attorney general to edit, file, or withdraw a court filing is not quasi-prosecutorial would

20   be unavailing.  Because the preparation of and filing of the Statement of Charges is a

21   quasi-prosecutorial function, Ms. De Leon is entitled to absolute immunity for any

22   *//*

1  "failure" to order her subordinates to alter or withdraw the Statement of Charges and for

2  her signature on the Statement of Charges.

3      3. <u>Mr. Wright</u>

4      Mr. Wright prepared the draft Statement of Charges and *ex parte* motion for

5  summary action.  (*See* 1st Madden Decl. ¶ 20, Ex. 19 ("Wright Dep.") at 139:24-140:5).)

6  Dr. Delashaw contends that he does not enjoy absolute immunity because "he had no

7  decision-making authority; he could only make recommendations."  (Pl. MSJ Reply at 5.)

8  Dr. Delashaw disregards Mr. Wrights role in preparing the Statement of Charges and the

9  *ex parte* motion for summary action.  Moreover, the fact that Mr. Wright was subordinate

10  to Dr. Roberts does not make his role any less quasi-prosecutorial.  Like Dr. Roberts, Mr.

11  Wright is absolutely immune from Dr. Delashaw's Section 1983 claims.

12      4. <u>Absolute Immunity Summary</u>

13      Based on the foregoing analysis, the court GRANTS Defendants' motion for

14  summary judgment with respect to Dr. Roberts', Ms. DeLeon's, and Mr. Wright's roles

15  in preparing for and/or seeking summary suspension of Dr. Delashaw's medical license,

16  including their actions relating to the Statement of Charges and the *ex parte* motion for

17  summary action.

18  **C.   Qualified Immunity**

19      Defendants contend that all five Defendants enjoy qualified immunity with respect

20  to Dr. Delashaw's Section 1983 claims.  (*See* Def. MSJ at 9-10.)  Because the court

21  concludes that Dr. Roberts, Ms. DeLeon, and Mr. Wright are absolutely immune, the

22  //

1    court analyzes Defendants claim of qualified immunity only as to the remaining

2    defendants, Mr. Matthews and Mr. Correa.

3         In determining whether a government employee is entitled to qualified immunity,

4    the court must decide:  (1) whether the facts that the plaintiff alleges assert a violation of

5    a constitutional right; and (2) whether the right at issue was "clearly established" at the

6    time the defendant engaged in the misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232

7    (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  To determine whether a

8    right was clearly established, "the standard is one of fair warning:  where the contours of

9    the right have been defined with sufficient specificity that a state official had fair warning

10   that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified

11   immunity."  *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (quotation marks

12   and citation omitted).  "The contours of the right must be sufficiently clear that a

13   reasonable official would understand that what he is doing violates that right."  *See id.*

14        Further, a state official's liability under 42 U.S.C. § 1983 is predicated on his

15   "'integral participation' in the alleged violation."  *Blankenhorn v. Cty of Orange*, 485

16   F.3d 463,  481 n.12 (9th Cir. 2007) (quoting *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th

17   Cir. 1996)).  "[I]ntegral participation does not require that each officer's actions

18   themselves rise to the level of a constitutional violation."  *Boyd v. Benton Cty.*, 374 F.3d

19   773, 780 (9th Cir. 2004).  "But it does require some fundamental involvement in the

20   conduct that allegedly caused the violation."  *Blankenhorn*, 485 F.3d at 481 n.12 (citing

21   *Boyd*, 374 F.3d at 780).  Where a "genuine issue of material fact exists that prevents a

22   determination of qualified immunity at summary judgment, the case must proceed to

1    trial." *Bonivert v. Clarkson*, 883 F.3d 865, 871-72 (9th Cir. 2017).  Courts may consider

2    the two prongs of the qualified immunity analysis in any order.  *See Chism v.*

3    *Washington*, 661 F.3d 380, 386 (9th Cir. 2011).

4         1.  Due Process

5         The Fourteenth Amendment's guarantee of procedural due process applies when a

6    constitutionally protected liberty or property interest is at stake.  *Vanelli v. Reynolds Sch.*

7    *Dist. No. 7*, 667 F.2d 773, 777 (9th Cir. 1982).  The court analyzes Dr. Delashaw's

8    procedural due process claim under the "familiar two-party inquiry" set forth in *Logan v.*

9    *Zimmerman Brush Co.,* 455 U.S. 422 (1982):  (1) Was the plaintiff deprived of a

10   protected interest; and (2) if so, what process was due?  *See id.*; *see also Mishler v.*

11   *Nevada State Bd. of Med. Examiners*, 896 F.2d 408, 409 (9th Cir. 1990).

12        "[A] professional license is property and is protected by the Constitution."

13   *Mishler*, 896 F.2d at 409.  Additionally, a protected liberty interest is implicated "if a

14   charge impairs [the plaintiff's] reputation for honesty or morality."  *Vanelli*, 667 F.2d at

15   777.  "The procedural protections of due process apply [to a liberty interest] if the

16   accuracy of the charge is contested, there is some public disclosure of the charge, and it is

17   made in connection with the termination of employment or the alteration of some right or

18   status recognized by state law."  *Id.* at 777-78.  At a minimum, the process due generally

19   consists of notice and an opportunity to be heard.  *Id.* at 778.  In determining more

20   specifically what process is due, courts consider factors including the private interest that

21   will be affected, the risk of an erroneous deprivation of that interest through the

22   procedures used, and the fiscal and administrative burdens that any additional procedural

requirements would entail.  *Id.* at 778-79 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Generally, even if "a post-termination hearing provides one with an opportunity to clear his name . . . compensable damages may arise for mental and emotional distress arising from the initial denial of due process."  *Id.* at 779 n.8 (citing *Carey v. Piphus*, 435 U.S. 247, 259-64).  Deprivations of liberty or property without notice and a hearing are generally allowed only when there is an "emergency situation" where "swift action" is necessary to protect public health and safety.  *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299-300 (1981); *see also Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1317 (9th Cir. 1989) ("[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of [post-deprivation procedures], can satisfy the requirements of procedural due process.") (internal quotation omitted).  However, in general, "something less than a full evidentiary hearing is sufficient prior to adverse administrative action."  *Cassim v. Bowen*, 824 F.2d 791, 798 (9th Cir. 1987).

Here, Dr. Delashaw claims that Defendants "deprived him of property and liberty without due process causing summary suspension of his license when no emergency existed."  (Pl. Resp. to Def. MSJ at 10.)  In addition to his property interest in his medical license, Dr. Delashaw asserts a liberty interest in his "professional reputation and ability to earn a livelihood."  (Pl. Resp. to Def. MSJ at 10.)  Defendants do not contest that Dr. Delashaw had a protected property interest in his medical license, but assert that no liberty interest was implicated because (1) the charges against him implicated his "incompetency or inability to get along with others," not his "reputation for honesty or

1    morality," and (2) any "interruption" in his liberty interest was "brief."  (Def. Resp. to Pl.

2    MPSJ at 14.)

3         With respect to Dr. Delashaw's property interest, even if Dr. Delashaw could

4    show that the summary suspension of his license violated his due process rights, neither

5    Mr. Matthews nor Mr. Correa was an "integral participa[nt]" in obtaining that

6    suspension.  *Boyd*, 374 F.3d at 780.  Mr. Matthews, WMC's Deputy Executive and

7    Legislative Director, had no role in any of the disciplinary proceedings, including the

8    summary suspension, but rather publicized the suspension through a press release and

9    conversations with the Seattle Times and others.  (*See* 1st Madden Decl. ¶ 5, Ex. 4 at 2,

10   *id.* ¶ 8, Ex. 7; *id.* ¶ 38, Ex. 37 ("Matthews Dep.") at 21:21-23:3.)  As for Mr. Correa, he

11   investigated the allegations against Dr. Delashaw and submitted a report to Mr. Roberts,

12   but had no role in deciding what evidence would be offered to the panel that would

13   consider the motion for summary action, only providing a declaration stating that his

14   summary interview notes were accurate and complete.  (1st Barbara Decl. ¶ 31, Ex. DD

15   ("Correa Dep.") at 39:9-40:10, 43:25-44:9.)  Because Mr. Matthews and Mr. Correa were

16   not integral participants in the violation of any clearly established due process right with

17   respect to the summary suspension, they are entitled to qualified immunity on Dr.

18   Delashaw's due process claim with respect to his property interest in his medical license.

19        With respect to Dr. Delashaw's asserted reputational liberty interest, Dr. Delashaw

20   does not argue that Mr. Correa had any role in publicizing his investigation.  (*See*

21   *generally* Pl. MPSJ.)  With respect to Mr. Matthews' publication of WMC's actions

22   against Dr. Delashaw, Dr. Delashaw fails to explain how notifying the public through the

1   press of the decision of the *Ex Parte* Panel, or his other communications about WMC's

2   actions, violated a clearly established right.  *See Serrano*, 345 F.3d at 1077 ("The

3   contours of the right must be sufficiently clear that a reasonable official would

4   understand that what he is doing violates that right.") (quotation marks and citation

5   omitted).  Therefore, Mr. Correa and Mr. Matthews are entitled to qualified immunity on

6   Delashaw's due process claim with respect to his reputational liberty interest.

7          2.  Equal Protection

8          Dr. Delashaw's equal protection claim is based on the "class of one" theory, in

9   which the plaintiff shows he or she has "been intentionally treated differently from others

10  similarly situated and that there is no rational basis for the difference in treatment."  (Pl.

11  MPSJ at 20 (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)).)  In the

12  Ninth Circuit, a "class of one" equal protection claim has three elements: the defendants

13  "(1) intentionally (2) treated [plaintiff] differently than other similarly situated [persons],

14  (3) without a rational basis."  *Gerhart v. Lake Cty., Mont*., 637 F.3d 1013, 1022-23 (9th

15  Cir. 2011).  Dr. Delashaw contends that he was "uniquely singled out for summary

16  action."  (Pl. MSJ at 22-23.)  Dr. Delashaw further contends that his alleged conduct was

17  "at worst comparable . . . and less serious" than that of other physicians who were

18  provided notice and a hearing before WMC took action against their licenses.  (*Id.*)

19  However, as discussed above, Dr. Delashaw presents no evidence that Mr. Matthews or

20  Mr. Correa played a role in WMC's presentation to the *ex parte* panel seeking summary

21  suspension.  Therefore, even if Dr. Delashaw could prove the other elements of his equal

22  protection claim, he fails to show that Mr. Matthews or Mr. Correa had any "integral

1  participation in the alleged violation." *Blankenhorn*, 485 F.3d at 481 n.12 (internal

2  quotation omitted).  Therefore, they did not violate any of Dr. Delashaw's clearly

3  established Fourteenth Amendment rights, and are entitled to qualified immunity.

4      3.  <u>First Amendment Retaliation</u>

5      Dr. Delashaw alleges that Defendants retaliated against him in violation of his

6  First Amendment rights, but the scope of his claim is unclear.  Dr. Delashaw's operative

7  complaint alleges only that Defendants "have retaliated against Dr. Delashaw for

8  exercising his constitutional right of access to the courts afforded to him by the First

9  Amendment to the United States Constitution."  (FAC ¶ 56.)  In his response to

10  Defendants' summary judgment motion, Dr. Delashaw addresses only the actions of Dr.

11  Roberts and not those of any other Defendant.  (*See* Pl. Resp. to Def. MSJ at 17-20.)

12  Therefore, the court accepts that Dr. Delashaw does not state a First Amendment claim

13  against any other Defendants and analyzes his claim here as against Dr. Roberts.  To

14  succeed on a First Amendment Retaliation claim, a plaintiff must show that:

15      (1) he was engaged in a constitutionally protected activity, (2) the
16      defendant's actions would chill a person of ordinary firmness from
       continuing to engage in the protected activity and (3) the protected activity
17      was a substantial or motivating factor in the defendant's conduct.

*O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie Sch.*

18  *Dist. 6J*, 467 F.3d 755 (9th Cir. 2006)).

19      Dr. Delashaw contends that Dr. Roberts "(1) . . . attempted to have Dr. Delashaw's

20  license summarily suspended for a second time, immediately after the merits hearing

21  panel reinstated it; and (2) also attempted to compel the Commission's supposedly

22

1    'independent' evaluators to change their favorable report concerning Dr. Delashaw's

2    fitness to practice."  (Pl. Resp. to Def. MSJ at 17.)  As set forth above, Dr. Roberts is

3    absolutely immune for his actions to seek summary suspension of Dr. Delashaw's

4    license.  *Supra* § III.B.  Because Defendants have invoked absolute immunity and

5    qualified immunity, the court first addresses whether Dr. Roberts is entitled to either form

6    of immunity with respect to his actions vis-à-vis the "independent evaluators."[3]

7            The basis of Dr. Delashaw's allegation with respect to independent evaluators is

8    that Dr. Roberts "provided the AAG/Prosecutor with a memo outlining his concerns

9    about the Hobday report" after Dr. Delashaw initiated this lawsuit and after Dr. Roberts

10   was recused from all WMC matters relating to Dr. Delashaw.  (Pl. Resp. to Def. MSJ at

11   18.)  Dr. Roberts initially approved Dr. Gabrielle Hobday and her colleagues to perform

12   an independent evaluation of Dr. Delashaw, which they did on December 3, 2018, several

13   months after MQAC issued its final order.  (3rd Madden Decl. (Dkt. # 53) ¶ 2, Ex. 1

14   ("Roberts Dep.") at 93:12-24.)  Dr. Hobday's resulting report found that "Dr. Delashaw

15   is at a low risk of engaging in disruptive behaviors in the work place.  This is the lowest

16   category risk we assign because we are never able to assign zero risk to future

17   behaviors;" and "we cannot conclude with a degree of medical certainty that Dr.

18

19   _____

     [3] The court's conclusion above that Ms. DeLeon and Mr. Wright are entitled to absolute
     immunity fully disposes of Dr. Delashaw's claims against them, because Dr. Delashaw's Section
20   1983 claims against those two Defendants are based on the actions with respect to Dr.
     Delashaw's suspension that the court addressed above.  *See supra* § III.A.  Because Dr.
21   Delashaw's First Amendment retaliation claim against Dr. Roberts involves a separate function,
     the court analyzes it separately here.  *See Tamas*, 630 F.3d at 842 (noting that absolute immunity
     is not available for an official's "investigatory conduct, discretionary decisions, or
22   recommendations.").

1    Delashaw has a concerning pattern of behavior[.]"  (1st Madden Decl. ¶ 54, Ex. 53.)

2    Afterwards, Dr. Roberts wrote to AAG Bahm and stated that he is "recusing [himself]

3    except for administrative duties in this case."  (3rd Madden Decl. ¶ 17, Ex. 16.)  In his

4    report, Dr. Roberts states that Dr. Hobday "was only provided information by Dr.

5    Delashaw and his attorneys."  (*Id.*)  Dr. Roberts goes on to state that MQAC's findings

6    "were treated as allegations rather than the legal legal (sic) findings of fact."  (*Id.*)  Dr.

7    Roberts goes on to point out what he views as additional deficiencies with Dr. Hobday's

8    assessment.  (*Id.*)  Dr. Roberts then requests that "Dr. Hobday be sent enough information

9    so as to be able to make a legitimate assessment" and that "the final order be treated as

10   fact that has been litigated and decided and not an allegation."  (*Id.*)

11          The court concludes that Dr. Roberts is entitled to qualified immunity on Dr.

12   Delashaw's First Amendment Retaliation claim.  Dr. Delashaw provides no case

13   authority under which privately commenting on an evaluation of a physician is an action

14   that would have a chilling effect on that physician's pursuit of legal remedies, nor

15   evidence that this litigation was "a substantial or motivating factor in" Dr. Roberts'

16   conduct.  *See O'Brien*, 818 F.3d at 932.  Therefore, the court GRANTS Defendants'

17   motion with respect to Dr. Delashaw's First Amendment retaliation claim.[4]

18   //

19

20          [4] Accordingly, Defendants are entitled to summary judgment on all of Dr. Delashaw's
      Section 1983 claims.  *See supra*  §§ III.B (concluding that Dr. Roberts, Ms. DeLeon, and Mr.

21   Wright enjoy absolute immunity with respect to their function of seeking sanctions against Dr.
      Delashaw, the basis of Dr. Delashaw's due process and equal protection claims), III.C

22   (concluding that Mr. Matthews and Mr. Correa enjoy qualified immunity with respect to those
      same claims).

### D.    State Law Claims

Defendants move for summary judgment on Dr. Delashaw's state law claims for defamation, false light, and tortious interference with business expectancy on the basis that they enjoy statutory immunity and a qualified privilege.  (*See* Def. MSJ at 10-11.) Dr. Delashaw's state law claims are based on the alleged injuries he suffered as a result of his summary suspension.  (*See* FAC ¶¶ 58 ("By obtaining his summary suspension for ill-founded and improper reasons, defendants tortuously interfered with Dr. Delashaw's legitimate business and professional expectancy in being able to continue to practice neurosurgery."); 60 ("Defendants' actions with respect to the summary suspension defamed Dr. Delashaw and placed him in a false light.").

WMC members "are immune from suit in an action, civil or criminal, based on its disciplinary proceedings or other official acts performed in good faith as members of the commission."  RCW 18.71.015.  Additionally, "[t]he secretary, members of the boards or commissions, or individuals acting on their behalf are immune from suit in any action, civil or criminal, based on any disciplinary proceedings or other official acts performed in the course of their duties."  RCW 18.130.300(1).  RCW 18.130.300(1) does not contain an express good faith requirement.  *Id.*

RCW 18.130.300(1) is part of the Washington Uniform Disciplinary Act ("UDA"), RCW ch. 18.130 *et seq*., which the legislature intended to provide "a uniform disciplinary act with standardized procedures for the licensure of health care professionals and the enforcement of laws the purpose of which is to assure the public of the adequacy of professional competence and conduct in the healing arts."  *Janaszak v.*

1 | *State*, 297 P.3d 723, 731-32 (Wash. Ct. App. 2013) (quoting RCW 18.130.010).  RCW

2 | 18.130.300(1) provides immunity to members of the DOH.  *See id.* at 730.

3 | Dr. Delashaw does not create a genuine dispute of material fact that any Defendant

4 | acted outside of "the course of their duties."  (*See* Pl. Resp. to Def. MSJ at 21-22.)

5 | Instead, Dr. Delashaw argues that the immunity provided by RCW 18.130.300(1) "only

6 | applies to claims based on violations of the [UDA]," and not to common law tort claims.

7 | (*See id.*)  Although cases applying RCW 18.130.300(1) are few, every case of which this

8 | court is aware is to the contrary.  Dr. Delashaw contends that the *Janaszak* court:

9 | > did not apply RCW 18.130.300 to common law claims for defamation and

10 | > intentional interference with a business expectancy.  Instead, it analyzed
> those claims under traditional common law principles.

11 | (*Id.* at 22.)  He is mistaken.  In *Janaszak*, after concluding that the plaintiff failed

12 | to support a prima facie case for his tort claims, the Washington Court of Appeals

13 | specifically concluded that "even if" the plaintiff had a cognizable negligent

14 | investigation claim, "the parties are entitled to statutory immunity under RCW

15 | 18.130.300."  *Janaszak*, 297 P.2d at 726.  The court also held that "the parties are

16 | also entitled to statutory immunity under RCW 18.130.300 against [the plaintiff's]

17 | common law negligence claims."  *Id.*  Indeed, Dr. Delashaw's argument runs

18 | contrary to the plain statutory language, which provides "immunity from suit in

19 | any action, civil or criminal, *based on* any disciplinary proceedings or official

20 | acts . . . ."  RCW 18.130.300(1).

21 | Every other case of which the court is aware reaches the same conclusion.

22 | *See Daniels v. Davis*, No. C08-5396FDB, 2008 WL 4681597, at *2 (W.D. Wash.

Oct. 21, 2008) (holding that the defendant "has statutory immunity from any state law claims under RCW 18.130.300"); *Farzad v. Dep't of Health-Med. Quality Assurance Comm'n*, No. 51340-4-II, 2019 WL 4667963, at *3 (Wash. Ct. App. Sept. 24, 2019) (affirming the trial court's grant of summary judgment in favor of the defendant against the plaintiff's state law claims—including negligence, defamation, and false light—based in part on RCW 18.130.300); *Saade v. Dep't of Health*, No. C19-470 TSZ, 2019 WL 4464401, at *5 (W.D. Wash. Sept. 18, 2019) (granting the defendants' motion to dismiss the plaintiff's negligence claims based on RCW 18.130.300); *Dutton v. Wash. Physicians Health Program*, 943 P.2d 298, 300 (Wash. Ct. App. 1997) (affirming summary judgment grant in favor of the defendant against the plaintiff's state law claims—including defamation—based on RCW 18.130.300).

Accordingly, the court concludes that Defendants are immune from suit on Dr. Delashaw's state law claims under RCW 18.130.300(1).[5]

//

//

//

//

//

---

[5] Because the court concludes Defendants are immune under RCW 18.130.300(1), the court declines to address whether Dr. Roberts is also immune under RCW 18.71.015 or whether Defendants enjoy additional state law privileges.

1

### IV.   CONCLUSION

2          For the reasons set forth above, the court DENIES Dr. Delashaw's motion for

3   partial summary judgment (Dkt. # 76) and GRANTS Defendants' motion for summary

4   judgment (Dkt. # 38).

5          Dated this 21st day of August, 2020.

6

7          _____

8          JAMES L. ROBART
           United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22